For the sake of being redundant, I'd like to point out that a lot of the issues that were addressed in the previous argument are going to be addressed here, so I'll try and focus on those factors that I think are most important. The underlying court in this case separated out one issue for trial and granted summary judgment in favor of the defendants on the other issue. The sole issue of trial was whether there was reverse confusion among general consumers of record-label products. The remaining issues, reverse and forward confusion as to all the other aspects of the defendant or the plaintiff's business, were granted summary judgment in favor of the defendants. Kennedy, just that one issue is here. All these issues were before the Court. Challenges to the jury instructions, motion to amend what happened, as well as the summary judgment ruling on other issues. And again, the lower court adopted an analysis of the trademark law, which eliminated a discussion of whether there would be likelihood of confusion as to affiliation, connection, association, sponsorship, or approval of the goods and services offered by the parties. And based our Corp versus 20th Century Fox, the 2003 U.S. Supreme Court opinion indicated that this statute under the Lanham Act 1988 amendments requires one to analyze whether there's likelihood of confusion not only as to origin of source or the traditional trademark analysis, but also to affiliation, connection, association, sponsorship, approval of the two parties' related products that they're selling under the mark. And in this case, the Court went and took the same step that was done in the previous case, and that is it addressed the sleep-craft factors to determine whether there's a likelihood of confusion, but again focused on an erroneous view of the strength factor by pointing out that strength had to consider the commercialization of the product, rather than just whether the product was fanciful on the continuum of trademark analysis. So what we're looking at in this case is the same thing as we did in the M.T. Communications case, and that is that this Court dealt with an issue that it shouldn't have dealt with on summary judgment, and it guided its decision-making process during trial, which we'll hear in a second. What is what was — I might not have clearly gotten your point on as to what the district court did or didn't do with the affiliation-relatedness of the 1988 amendments. It didn't deal with it. It never addressed — it never gave the — it never looked at that issue of whether there was affiliation, connection, association, sponsorship, or approval between the parties' goods. It only looked at — How did you raise it to the district court? In the summary judgment briefing? In there and in — At the trial level? There were instructions presented at the trial level that would have brought that to the Court's attention that were rejected over objection. And at the — on the summary judgment briefing, it was raised to the Court that the connection of the affiliation, sponsorship, approval, that analysis had to be done. The Court just didn't adopt it. The Court focused on the same as it had in the previous case, which was the source of origin. In your view, would you go through the same sleek craft factors? Yes. But there are some key differences in this case as opposed to in the M2 Communications case. In the Madison case, the case before the Court right now, the analysis on the strength factor is the same. The Court should not be looking at the commercial aspects of a product line bearing the mark or a company bearing the mark. That market analysis is only dealt with on trademarks that are descriptive or suggestive or in a dilution analysis or in a trademark, a trade dress analysis where you're not dealing with a registered trademark. But this all went to the jury. No. This did not. The issue that's before us that went to the jury. The issue that I'm talking about now, the strength of the mark, that issue I'm talking about now is dealt with on summary judgment. The jury below was only given one. There were a couple of critical charges, but the jury only had to address whether it was likely to cause whether the use of the two marks or whether the use of the M2 Entertainment mark was likely to cause ordinary members of the general public who were doing business or considering doing business with plaintiff to mistakenly believe that they were dealing with M2 Entertainment. And that narrow language eliminated the more logical verdict or analysis of whether there was affiliation, whether there was connection between these two companies. So when a consumer walks in to a record store that sells Christian music records or CDs and picks up one of those CDs and says on the back, M2, or it picks up one of the, in this case, I'm getting them confused around. I apologize. I've done that twice now. In this case, we're talking about sports CD compilations and it looks on the back and it says M2 Entertainment. And then it goes across the hall or over to another store, even in the same store, and picks up a Buckethead CD that says M2 Entertainment or goes on Amazon.com and finds that M2 Entertainment, I mean, M2 Software is producing that. There's a confusion as to whether they're affiliated in that sitting. But also there's a confusion as to affiliation or sponsorship or connection between these two companies when my client is selling its RMS services to record labels or its publisher services to music publishers who are also in the content business. These are not three distinct industries. They're all the same products in the same industries and in the same industry. So that confusion is the analysis that the court took in the Madison case before us right now was erroneous. There were a number of factors that were different. One was we have actual confusion in this case. We have a record label, BMG, an executive of BMG, who thought when she saw an advertisement of M2 Entertainment that she was looking at my client. No, that isn't what it said, though. I thought she just said, you know, I saw this and then I thought of you. She had to read the article before she realized it was not my client. That's what the deposition testimony says. Well, we'll look at it. That would be found for the Court's convenience at the excerpt for Record 291. And it's also pointed out in the opening brief at page 36. Another factor that's present in this case is that Madison's own attorney recommended going in on a different direction than using the M2 mark because of my client's presence and how long my client had been there. That's addressed in the opening brief at page 38. But some of the other key factors that are present here that weren't present in the M2 communications case is that in this case, both parties debuted their M2 marks at MIDEM, which is a trade show at Cannes held in, I believe, January rather than June. And although they debuted their marks at the same trade show, they did so in different years. They advertised in the same music industry publications. Billboard Advertisement is an example, a huge spread of like 20-page special advertisement talking about the launching of the M2 record label line. There's also trade shows that they'll both attend and confront one another at, New Music Seminar, for example, Digital Hollywood. They've had overlapping proposals at BMG Entertainment. That's highly relevant. They're both making the same proposals for record content purchases or sales at the same label. Those factors were not present in the M2 communication in the same way that they are here. But I think it's important for the Court to remember that you don't address in the strength of the mark. When you determine the strength of the mark, you do not address commercial success or a marketplace analysis, how strong that mark is, unless that mark needs to be bolstered by some kind of commercial significance. Otherwise, it's inherently distinctive. And this mark, M2, has been found to be a fanciful mark. It's at the top of the spectrum of trademarks and doesn't need commercialization to have that inherent distinctiveness. This isn't a trade dress case. This isn't a dilution case. We're talking about trademark infringement, talking about trade name infringement, trademark infringement. So we need not do that. The mark is strong. It's fanciful. Proximity is important in this case, as it was in the M2 case. But the court, the district court here made some crucial errors at trial that are important, and I'll tie that in. When the court set jury trial on the limited issue. Usually you have a strong mark, but its use in commerce is very, very, very, very limited so that only maybe five or six people have purchased the product. You don't look to see what the advertising has been on the mark, tie it in with your client? Well, I'm questioning whether or not. How do you separate the two? Under your scenario, there may not even be a valid trademark with five or six people only knowing about it. Well, let's say it's a valid trademark, but its exposure has been very, very limited. In other words, when you look, if the mark is strong because it's fanciful, the analysis of likelihood of confusion is not how many people have been confused. It's quantitative rather. I mean, it's qualitative rather than quantitative. So in this situation, if we only have 20 customers and 10 of them because of who they are and where they are in the marketing channel are likely to be confused, 50% of our customers would be confused rather than just five or 10. What's the evidence here of likelihood of confusion? The likelihood of confusion analysis, we've got actual confusion among BMG Entertainment. We've got overlapping proposals being made by both companies to BMG Entertainment without them knowing that they were coming from – we've got Mattis's own attorney telling them ahead of time to avoid, to consider going in a different direction than using the M2 mark. I don't think he's just done that out of extreme caution. Most lawyers tell that to their clients. Well, they told that to their client here because of us, because we're out there. Well, he said he thought that you can probably carve an itch out for yourself. But if he were starting over again, he'd say don't go the M2 route. Right. If they hadn't already adopted it, he would suggest not going there. And there's a lot of overlap in the advertising. When you say there were overlapping proposals to the one – what do you mean by overlapping? Proposals went into both – went into BMG Entertainment by both companies within a very short period of time. To do what? For purchasing. I believe purchasing or selling record content. Purchasing what? Purchasing or selling record content. I can't remember. Purchasing or selling. Licensing. Licensing record content. Acquiring. You guys are confused. That's it. Well, I'm just – when you say there are overlapping proposals, I don't know whether – To license content. To license content. M2 Software approaches BMG and says, I want to license some of your content. And M2 Entertainment approaches BMG and says, I want to license some of your content. And your contention is that they would think they're dealing with the same people. Yeah. I mean, the fact is that has – there was a confusion as to whether M2 Entertainment was my client by an executive at BMG. The overlapping proposals goes to the issue of market channel, goes to the issue of proximity, goes to the issue of relatedness. Okay. There are these eight sleep craft factors that have to be addressed in an analysis when you don't have a situation where a client is – where the parties are selling to the same consumers the same goods and services. So in this situation, you have to evaluate the strength of the mark, the proximity, the similarity, evidence of actual confusion, marketing channels that are used, the types of goods and degree of care by the purchasers, and the likelihood of expansion of the product lines. The issue of actual confusion we have in this case, we have intent where the attorney recommended against going forward with the M2 mark in light of our presence. Marketing channels, we've got overlapping proposals being made to BMG for licensing of content. We've got advertisement in the same media. We've got appearances at the same trade show. Are the record content different? Yes. But the fact of the matter is they are confronting one another in these places. Now, the next year's MIDEM might have two banners, M2 Entertainment on one side of the room and M2 Software on the other side of the room. That's the problem. At the jury trial, there were some key errors made. I think they need to be pointed out to the court. That is, the court refused to instruct on the likelihood of confusion as to affiliation, connection, sponsorship, association or approval. And in the briefing, the defendants, or M2 Entertainment, Madison, claims that we waived that jury instruction. I want to point the court to the reply brief at page 19, note 14, because that sets forth the excerpts of record where that was not waived. That was objected to, and the court overruled the objection and went forward on its own with its own instruction. The other thing I'd like to point out is that since the briefing was concluded, new cases come down out of the Ninth Circuit that addresses squarely what the standard of review should be when there's an issue of law as to a jury instruction, when a jury instruction deals with an issue of law. And the court held that the review will be de novo. And that was in Snake River Valley v. Pacific Corps at 357 F. 3rd, 1042, page 1052, note 11. And that's a Ninth Circuit 2004 opinion. And in addition, the refusal to instruct on the likelihood of confusion, which can, in addition to all the cases cited in the brief, the court can turn its attention to the Fuddruckers case at 826 F. 2nd, 837 as an additional citation. It allowed for the erroneous argument that was contrary to the law to be made during closing at the trial, and that was that the registration is somehow limited and it was ruled, even though that was ruled error by the Ninth Circuit in the companion peer case, the Viacom decision. There was also error where the court instructed the jury that in order to find reverse confusion, that there would have to be a saturation of the market. That's not necessary. Reverse confusion is just another thing. It's another flavor of confusion. It's a question of whether if you entered the market with the mark as a junior user, if people are going to think I am affiliated with you rather than you affiliated with me. That's the only difference there. And you don't draw into it commercial analysis any more than you would in the forward confusion case just because you want to. You don't do that if it's a fanciful mark. And then I think the briefing is clear on the motion to eliminate and the other arguments that we made about errors, but I want to point the Court to the exclusion of survey evidence being error. We prepared a survey that was going to assist us at trial in determining whether the marketplace would be confused as to these two marks. And the Court excluded that because my client designed the actual questions, even though the survey was conducted and performed by an independent survey company. The law is pretty clear in click billiards. The Court says that designing the survey goes to the weight of the survey, not the admissibility of the survey. And by the Court's exclusion of the survey prevented us from putting that in front of the jury. And the bottom line was that at that trial, the Court let third-party infringer use be admitted that was put in by M2 Entertainment and Madison, but denied the plaintiff the opportunity to introduce its enforcement efforts against the M2 use. And that's critical here because, as I've mentioned before, the M2 mark has been strenuously enforced by my client. It's not out there being used by multiple people in this industry. And to say that there are a lot of people using the mark but not tell them that they've all been sued or challenged by my client is error. It's prejudicial. So I'll save the remaining 30, 40 seconds for rebuttal and answer any of your questions at that time. Roberts. May it please the Court. Robert Rothstein, forward defendant, Appley-Madison et al. The key as to why the district court's judgment should be affirmed in all respects lies in what the parties do and what they sell. And notwithstanding the contention that they're directly competing products, the products are remarkably different. Plaintiff M2 software is in the data processing business. It primarily sells royalty accounting software that goes to accounting departments of record companies. It has this publishing software that goes to the accounting departments of publishing companies, but basically it's the same thing. And on a few occasions it services the software. And in the record, in fact, the agreement where it services the software is called a royalty processing agreement. So M2 software's business is data processing. Now, it tried but failed to get into a consumer business, which also was very different. And the record in our case is that over a three-year period, plaintiffs sold only over Amazon.com, not in any record store, not in any retail store, between 80 to 120 copies of this video CD-ROM featuring this avant-garde rock guitarist called Buckethead. And it's interesting that, and I think we'll leave the Court, we made a motion that was granted, has Buckethead CD-ROM as well as Mattissey's product, the audio CDs before it. But the Buckethead video CD-ROM has to be played in the computer. It's interactive. In order to operate and get various segments, one has to click on the mouse. It contains video. It emphasizes video. And what's also key is that M2 software did the technology work for that product. It wasn't really the content provider. Buckethead was. And Buckethead also has a trademark. In today's parlance, and I guess we do it on a computer all the time, M2 software burned the CD-ROM. So that was its business. It was technology. But it really wasn't able to get in that business. Eighty to 120 is not a business. And I'll talk about that. In contrast, my client Mattissey did one thing and one thing only under the M2 Entertainment mark. It distributed somewhat less than 40,000 audio CDs, devices that you can put in your car stereo, that you can put in a usual CD player. It's not interactive. It just plays. And they did so over a six-month period. And that's all Mattissey did. Mattissey did not use M2 Entertainment as a record label. It had intentions to do so, but it never did. Stopped after this lawsuit was filed. It never negotiated licenses with record companies under the M2 Entertainment label, contrary to what plaintiff's counsel said. Any licenses negotiated with record companies was under the Mattissey name. So the fact is that data processing is not audio sports CDs. And again, the CDs that Mattissey used were featured sports teams, the Chicago Bulls, the Lakers, arena music calls. And that's not a video CD-ROM, a computer CD-ROM of Buckethead. And from those facts, I think the conclusion flows that both on summary judgment, Judge Baird granted summary judgment on most of the issues, and at trial, the court below decided properly. Now, I first want to turn to Judge Baird's partial summary judgment. Judge Baird granted summary judgment as follows. She said that there was no likelihood of any type of confusion, forward or reverse confusion, among members of the record industry. She also held that there was no likelihood of forward confusion among general consumers. And then the last issue, reverse confusion among general consumers, went to trial before Judge Mattis. And Judge Baird, in fact, did consider affiliation. But the Court need not even – affiliation sponsors – the Court need not even consider that, though, because review is de novo. And based on de novo review, there simply is no genuine issue of material fact as to likelihood of confusion among the record industry. And the sleek craft factors do apply. I believe Judge Canby asked the question about directly competing products. Well, these are not directly competing products under the law. Certainly, data processing and audio CD-ROMs are not directly competing. But even the video CD-ROM, which go in a computer, which have different functions, which have video and are a different genre of music, are not directly competing products. The Court held in the sleek craft case that expensive high-speed boats weren't directly competing products. In fact, that's how the sleek craft factors developed. Two very expensive boats, speedboats, one, I guess, appealed to racing enthusiasts. The other was more of a family-oriented. But those weren't directly competing products. A stationary bike and elliptical bike in the Thane International case, a recent opinion of the Court, were held not necessarily to be related products, related. And they weren't necessarily, they weren't treated as directly competing. So looking at the genre and looking at the fact that one is a video computer CD-ROM, plaintiffs, and Madison's product was an audio sports CD, the products are not directly competing. And therefore, it's particularly appropriate to apply the sleek craft factors. Now, the key factors in this case, and the facts are not disputed, are, number one, the products are different. I've talked about that. But two, as to the record industry, the sophistication of the user. Plaintiff's product was marketed, the record is undisputed, primarily face-to-face and by word of mouth. And it's expensive. Plaintiff dealt with record insiders. They know who Plaintiff is, and they're going to be able to distinguish Madison. And it's interesting that Madison's audio sports CDs were a pre-existing line, a pre-existing product. It was a company called SFX Alphabet City that already distributed them. They continue to do it. Madison just added the N2 Entertainment mark as a distributor. There absolutely is no issue with the fact that sophisticated record industry executives are going to be confused by that. And sophistication, along with relatedness, is a key factor. The marketing channel is also different. In fact, the parties did not attend the same trade shows at the same time. They attended, both attended medium in different years, 8 years later. There was no overlap. And, again, Plaintiff's software was certainly marketed really by word of mouth. I think Plaintiff's counsel indicated that both appeared in Billboard. That's not the case. In 1992, 1994, I can't remember the precise date, Plaintiff ran an ad for his software in International Buyer's Guide. Billboard happened to publish it. It's a different publication from the February 2000 edition of Billboard magazine. So there was no overlap in marketing channels. And certainly, Madison did not market its sports CDs to the royalty accounting departments of record companies. Madison's customers were retailers, Sam Goody's and then arena stores, the Lakers store. That was not where Plaintiff marketed its accounting system. In fact, it's undisputed that the accounting system was never marketed to consumers whatsoever. As to the issues, the other split craft factors, the issues of intent to confuse, Plaintiff's counsel mentioned this letter. The letter says that, excuse me, the letter says that Madison can carve out a niche for itself, but what's also undisputed in the record is the declaration of David Alter of Madison on summary judgment, where he said that he had subsequent discussions with his attorney. He clarified that Madison could go ahead free from liability and that Madison relied on its attorney's advice. That's at the supplemental excerpt of record 49, page 4. So that is undisputed, irrespective of a letter on summary judgment. And there's no intent to, certainly no intent to confuse and no evidence. As to another split craft factor, actual confusion, the, her name is Ms. Wems, I think she was a former BMG executive. She was a friend of Mr. Escamilla, the president of M2 Software. She saw the ad, called it up and said something like, oh, you know, Madison is using your mark. She wasn't confused at all. She said she knew the ad was for Madison. That's not trademark infringement. Trademark infringement requires confusion. So there was no evidence. There's no evidence that Ms. Wems was confused. And again, because she was a friend, the law is pretty clear that close associations don't give rise to evidence of actual confusion. As to the survey, on summary judgment trial, Mr. Escamilla is not an expert. The Court doesn't need to get to the issue of the survey. It's flawed as a matter of law. But Mr. Escamilla is not an expert. You have to qualify as an expert in the threshold matter, and he did not. So that leaves two issues on summary judgment, strength and similarity of the marks. And the real question, I think, as to strength in this issue about conceptual versus commercial strength is whether or not, yes, I think Judge Barrett recognized that certainly with the record label management system, there was some commercial or some conceptual strength, arbitrary, fanciful mark. The question is, though, in light of these other factors where you have a sophisticated consumer that is members of the record industry, you have the products are not the same, you have different marketing channels, will conceptual strength save plaintiff's claim? And the answer has to be no. And that's where the relevance of commercial strength can come in. If it's Kodak, a fanciful name, perhaps the market strength, the commercial strength is so large that it will overcome those other factors. Here, however, notwithstanding the conceptual strength, which is just a name, the conceptual strength can't overcome the lack of a triable issue of fact as to the other factors. The same goes for similarity of the mark. In all cases, there's going to be some similarity in all trademark cases that survive Rule 11. In this case, as Judge Baird recognized, there's a difference in the appearance. Madison always used the mark entertainment, M2 Entertainment, and on Madison's product, it was one of many logos and wasn't very important. On all the audio CDs, it was either the Lakers or the Bulls, the NBA, the name of the music. There were the names of various record companies. There was the name of that other company, SFX Alphabet City. So the bottom line is conceptual strength and similarity simply cannot overcome the absence of a triable issue of fact as to the other factors. And, therefore, Judge Baird properly granted summary judgment as to members of the record industry. She also properly granted summary judgment as to forward confusion relating to M2 Software's consumer product, the Buckethead CD-ROM, the 80 to 120 that were sold only on Amazon.com. And there's a threshold that I think the Court, in its opinions, has set forward. Confusion has to be to an appreciable number of consumers. I think the Brookfield case talks about a situation where sales can be so flabby that there can't be confusion as a matter of law. And this is one of those cases. 80 to 100 over a three-year period over Amazon simply can't give rise to a likelihood of confusion. Especially when the M2 Software mark is not the only trademark on the video CD-ROM. Buckethead is the primary trademark. And especially also where if a consumer is going to try to find these, and, again, Amazon.com is the only intersection in where these works were marketed. The Buckethead CD-ROM was never marketed in any retail store, much less any store where Mattis' sports CDs were. But to search, no one, at least no reasonable jury could conclude that anyone is going to search Amazon.com to try to find either Buckethead or Mattis' Lakers or Bulls audio CD by putting it in M2. They're going to put in Buckethead, if they're a Buckethead fan. They might put in the title if they've heard the title. Or they're going to put in Lakers or sports music genre. But it is no evidence, and it is no evidence in the record to support a likelihood of confusion that anyone would search using the M2. And, therefore, that obviates, in light of the flabby sales, any likelihood of confusion. The strength issues, the intent issues, well, the strength issues are even here, whether you call appreciable number, commercial strength, or a threshold. The 82-120, I don't think it even meets the threshold. But, certainly, it gives no rise to commercial strength. In fact, it saved the absence of a tribal issue of fact. Do you use all the same arguments for affiliation-relatedness? Yes, Your Honor, and the Court considered it, sure. Because it goes to sophistication and it goes on. As far as the CD-ROM, it goes to the lack of appreciable number ever being confronted with plainest product. I mean, likelihood of confusion goes to an appreciable number of consumers. And here, as a matter of law, with 80-100, that's far below the threshold. And, again, there's no tribal issue of fact also because of some of the cases in terms of consumer care, cases out of the circuit talk about how important really is the mark to consumer purchasing. And to consumers, the M2 mark on either of these products, on both of these products, is not all that important. Buckethead, it says Buckethead, he's got the TM, that's the important mark on plainest product. On my client's product, it's the Los Angeles Lakers, people who want to hear sports movies. So that, coupled with the flabby sales, goes to the issue of affiliation and sponsorship also, which Judge Baird did consider. With that, I'd like to turn to the remaining issue at trial that was tried, and that goes to the reverse confusion among consumers. And in its brief on appeal, M2 software really doesn't challenge the merits. It does contend that there's error with respect to jury instructions. I want to primarily focus on that. Here's what happened. And the bottom line is, I would say two things. Number one, the law was correctly stated. But, number two, none of the arguments that they make on appeal were raised below. So let me talk about the second thing first. Here's what happened. The parties submitted voluminous, I'm embarrassed to say, too voluminous jury instructions. Actually, the first time around, it was probably more. There were two go-arounds. And Judge Matz, on the first go-around, ordered that, and this is in the record, ordered that, I'm not going to accept these, they violate the local rules, they're  And again, he said, too much. He almost literally said, go out in the hall, it's all, again, all in the record, and work it out. The parties worked it out. And when plaintiff's counsel came back, he agreed that the instruction relating to affiliation, sponsorship, et cetera, that he proposed was that his instruction number 7 was, could be withdrawn. It's on the record. It's at supplemental excerpt of record 293 at 36337. And you'll see there's some colloquy between Judge Matz and my partner, Lisa Stone, and Ms. Stone is saying which ones were withdrawn, and included in that was number 7, plaintiff's proposed number 7, and that was the affiliation sponsorship instruction. And thereafter, in the entire discussion, there's no objection to that instruction or to the lack of language of affiliation or sponsorship. It just didn't happen. That was withdrawn. And I know plaintiff's counsel says, well, these earlier ones were objected to. They were disputed, but Judge Matz never ruled on them. He told us to go back in his discretion, and I think he was right. He said they were way too long. That being said, I think the instruction that was given, which said dealing with sets forth the law of this circuit, is set forth in DreamWorks and other cases, dealing with is broad enough to include affiliation or sponsorship. But the argument was never raised below and its way. Same goes for the second instruction that allegedly was erroneous, and that is the instruction that said that reverse confusion requires saturation of the market. Again, looking at excerpt of record 239, again, this is kind of proving a negative, there was no objection to that. And, in fact, the plaintiff proposed its own instruction earlier on in the case, which had saturation as a requirement for reverse confusion. That's at excerpt of record 272. It was part of that group that Judge Matz never saw, but it was proposed. So in conclusion, Judge Baird correctly ruled, based on the key factors of Sleek record, there was no genuine issue of material fact, and there was no error at trial. The objections were waived. The law was stated correctly anyway. And we respectfully request that the judgment be affirmed in all respect. Thank you. Thank you. Your Honor, this is a trade name case. M2 Entertainment is a division of Madison that communicates with its customers through record labels. It has M2 on the back of its CDs as the record label. When my client sells, is lucky enough to sell a CD, it has M2 on the back of it as the record label. My client sells record content, which is what you would call that music or artist. Online has been doing so since the advent of the computer. He has been in the record content industry since 1991. He's never left it. He's never abandoned it. He's not just a data processor business. He provides a lot of services to record management, record label services, record label management systems, and music publisher management systems. He provides the ability to track and catalog their artists, to track and catalog their albums, to see what the wealthy rates are earning off of each one of those, and items that are relevant to people who are selling the content that they control and own, who are licensing the rights that they control and own. It's all a part of this huge industry. The two things that we've focused on here, the one thing that we've focused on here is whether the product that they put on the storefront with the NBA Lakers compilation of songs and what have you that are played at the stadium are going to somehow or another, they're so different, this little niche. It's no different than the M2 Communications argument that it's Christian music. The point is that if you look at the analysis of the sleek craft factors, when you look at similarity of marks, they're identical. When you look at proximity, you see that they're in the same industry. They're running across one another all the time. The likelihood of expansion to do what my client's doing by a record label is well known. Many do it. My client competes with those record labels for the businesses that he offers and the services he offers. All of these factors are ignored by the defendant. The affiliation sponsorship association and approval analysis was not dealt with below, and that's error. That has to be dealt with. That's the situation that we have here. So given all that, I think that there's no way that the court could have ruled below that there was no genuine issue of material fact, that this should go back and try on the merits. Thank you. Thank you very much. The matter will stand submitted, and the court will recess until 8 a.m. tomorrow morning. What? 8 or 9? 8. Tomorrow at 8 o'clock. Okay. 8. I'm not coming. All right. Thank you. I'll be here. I'll be here. Okay.
judges: Pregerson, Canby, Beezer